UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
                           :

UNITED STATES OF AMERICA

                           :       <u>OPINION AND ORDER</u>

      - against -          :       04 CR 690 (SAS)

MICHAEL YANNOTTI,          :

          Defendant.     :
-------------------------------------------------------X

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.   INTRODUCTION

On July 21, 2004, Michael Yannotti was charged with committing the following four crimes: (1) the substantive offense of engaging in the affairs of the Gambino Organized Crime Family in violation of the Racketeering Influenced and Corrupt Organizations Act ("RICO"); (2) conspiring to participate in the affairs of the same enterprise; (3) murder of Robert Arena in aid of racketeering; and (4) murder of Thomas Maranga in aid of racketeering.[1]

The substantive RICO charge against Yannotti included four predicate acts. Racketeering Act One charged Yannotti with conspiring to kidnap,

---

[1] *See* Indictment 04 CR 690 (S.D.N.Y. July 21, 2004) ("Indictment") (charging a violation of 18 U.S.C. § 1962(c), 1962 (d) and two violations of 18 U.S.C. § 1959(a)).

the kidnapping, and the attempted murder of Curtis Sliwa.[2] Racketeering Act Two charged Yannotti with conspiring to murder Arena, the murder of Arena, and the murder of Maranga.[3] Racketeering Act Three charged Yannotti with the attempted murder of Robert Tarantola.[4] Finally, Racketeering Act Seven charged Yannotti with conspiring to make extortionate extensions of credit and conspiring to collect extensions of credit through extortionate means.[5] A trial on these charges was held in August and September of 2005.

On September 20, 2005, after seven days of deliberations, the jury returned a note stating that it had reached a verdict and enclosing the completed Verdict Sheet. After reviewing the Verdict Sheet, I informed the parties that the jury had not checked guilty or not guilty on Count One as to any defendant because it had not unanimously found that the Government proved two predicate acts against any defendant.[6] I then sought the views of the parties as to whether this constituted an acquittal or a hung jury. After much colloquy, Yannotti agreed

---

[2]     *See* Indictment ¶ 14(a), (b) & (c).

[3]     *See id.* ¶ 15(a), (b) & (c).

[4]     *See id.* ¶ 16.

[5]     *See id.* ¶ 20(a) & (b). The intervening Racketeering Acts (Four through Six) relate to codefendants and are not relevant here.

[6]     *See* Trial Transcript ("Tr.") at 5289.

to accept a mistrial on the deadlocked count, reserving his right to move for a judgment of acquittal in a post-trial motion.[7]

Although the jury was specifically instructed not to do so, it provided the vote split on each of the predicate acts. The following chart depicts the jury's verdict.

COUNT ONE:     RICO Substantive

|  | Proved | Not Proved |
|---|---|---|
| *Racketeering Act #1* | | |
| Conspiracy to Kidnap Curtis Sliwa | 7 | 5 |
| Kidnaping of Curtis Sliwa | 7 | 5 |
| Attempted Murder of Curtis Sliwa | | X |
| *Racketeering Act #2* | | |
| Conspiracy to Murder Robert Arena | | X |
| Murder of Robert Arena | | X |
| Murder of Thomas Maranga | | X |
| *Racketeering Act #3* | | |
| Attempted Murder of Robert Tarantola | | X |
| *Racketeering Act #7* | | |
| Conspiracy to Make Extortionate Extensions of Credit | X | |
| Conspiracy to Collect Extensions of Credit through Extortionate Means | X | |

COUNT TWO:     RICO Conspiracy
Guilty__X__     Not Guilty_____

---

[7]     *See id.* at 5315.

<u>COUNT SEVEN</u>: Murder of Robert Arena in Aid of Racketeering
                 Guilty_____         Not Guilty__X__

<u>COUNT EIGHT</u>: Murder of Thomas Maranga in Aid of Racketeering
                Guilty_____         Not Guilty__X__

The RICO statute prescribes a five-year statute of limitations.[8] Because this Indictment was filed on July 21, 2004, at least one of the predicate racketeering acts charged against Yannotti in the substantive RICO count must have occurred or continued past July 21, 1999. It is undisputed that three of the four predicate acts alleged against Yannotti occurred outside the limitations period.[9] However, the parties are in disagreement as to whether the fourth charged racketeering act – the two loansharking conspiracies – falls inside or outside of the limitations period.

Under Second Circuit law, the statute of limitations analysis for a RICO conspiracy is different than that for a substantive RICO violation. For a RICO conspiracy offense, the statute of limitations starts running "when the

---

[8]     *See* 18 U.S.C. § 3282; *United States v. Spero*, 331 F.3d 57, 59 (2d Cir. 2003).

[9]     The charged racketeering acts involving Sliwa occurred in 1992. The charged Arena murder conspiracy and murders of Arena and Maranga occurred in 1996. The charged attempted murder of Tarantola occurred in 1987.

4

purposes of the conspiracy have either been accomplished or abandoned."[10] In *United States v. Persico*, the Second Circuit explained that "the agreement proscribed by section 1962(d) is conspiracy to participate in a charged enterprise's affairs, not conspiracy to commit predicate acts."[11] By contrast, a substantive RICO charge "is barred by limitations as to any defendant unless *that defendant* committed a predicate act within the five-year limitations period."[12]

Yannotti argues that the Government failed to prove that he had any involvement with the charged loansharking conspiracies after July 1999 and therefore, none of the charged predicate acts fall within the limitations period. Accordingly, he moves for a judgment of acquittal on both RICO counts pursuant to Federal Rule of Criminal Procedure 29 ("Rule 29").[13] For the following

---

[10]     *United States v. Salerno*, 868 F.2d 524, 534 (2d Cir. 1989) (citing *United States v. Persico*, 832 F.2d 705, 713 (2d Cir. 1987)).

[11]     *Persico*, 832 F.2d at 713.

[12]     *Salerno*, 868 F.2d at 534 (emphasis in original) (citing *Persico*, 832 F.2d at 705). Yannotti also joined in the motion brought by co-defendant John A. Gotti seeking a judgment of acquittal based on the jury's inability to reach a unanimous verdict with regard to predicate acts, which has been denied. *See United States v. Gotti*, No. 04 CR 690, 2005 WL 3358643, at *1 (S.D.N.Y. Dec. 8, 2005).

[13]     Yannotti withdrew his motion pursuant to Federal Rule of Criminal Procedure 33 for a new trial on the RICO conspiracy count. *See* 12/1/05 Letter from Diarmiud White, Yannotti's attorney.

reasons, Yannotti's motion is granted in part and denied in part.

## II. LEGAL STANDARD

To prevail on a motion for a judgment of acquittal under Rule 29, a defendant must show that "the evidence is insufficient to sustain a conviction."[14] "[A] defendant making an insufficiency claim bears a very heavy burden."[15] "The ultimate question is not whether [the court] believe[s] the evidence adduced at trial established defendant's guilt beyond a reasonable doubt, but whether any rational trier of fact could so find."[16] "In other words, the court may enter a judgment of acquittal only if the evidence that the defendant committed the crime is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt."[17]

A court must grant a motion under Rule 29 "if there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable

---

[14]     Fed. R. Crim. P. 29(a).

[15]     *United States v. Desena*, 287 F.3d 170, 177 (2d Cir. 2002). *Accord United States v. Best*, 219 F.3d 192, 200 (2d Cir. 2000).

[16]     *United States v. Payton*, 159 F.3d 49, 56 (2d Cir. 1998) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (emphasis omitted).

[17]     *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999) (quotation marks and citation omitted). *Accord United States v. MacPherson*, 424 F.3d 183, 187 (2d Cir. 2005).

doubt."[18] "But at the end of the day, 'if the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt.'"[19]

In considering the sufficiency of the evidence, the court must "view all of the evidence in the light most favorable to the government."[20] A court must analyze the pieces of evidence not separately, in isolation, but together, in conjunction with one another.[21] Accordingly, a court must apply the sufficiency test "to the totality of the government's case and not to each element, as each fact may gain color from the others."[22]

To avoid usurping the role of the jury, courts must "'resolve all issues

---

[18]     *United States v. Mariani*, 725 F.2d 862, 865 (2d Cir. 1984).

[19]     *United States v. Cassese*, 428 F.3d 92, 99 (2d Cir. 2005) (quoting *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002)) (ruling on a Rule 29 motion).

[20]     *United States v. Aleskerova*, 300 F.3d 286, 292 (2d Cir. 2002); *United States v. Reyes*, 302 F.3d 48, 52 (2d Cir. 2002).

[21]     *See United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000).

[22]     *Guadagna*, 183 F.3d at 130. *Accord Reyes*, 302 F.3d at 53 ("[W]e consider the evidence as a whole.").

of credibility in favor of the jury's verdict.'"[23] "[T]he credibility of witnesses is the province of the jury, and [a court] simply cannot replace the jury's credibility determinations with [its] own."[24] "[T]he task of choosing among competing, permissible inferences is for the [jury], not for the reviewing court."[25] Furthermore, "the jury's verdict may be based on entirely circumstantial evidence."[26] Because the jury is entitled to choose which inferences to draw, the Government, in presenting a case based on circumstantial evidence, "need not 'exclude every reasonable hypothesis other than that of guilt.'"[27] But "a

---

[23]     *Desena*, 287 F.3d at 177 (quoting *United States v. Desena*, 260 F.3d 150, 154 (2d Cir. 2001)).

[24]     *United States v. James*, 239 F.3d 120, 124 (2d Cir. 2000). *Accord Autuori*, 212 F.3d at 114 (a court "may not substitute [its] own determinations of credibility or relative weight of the evidence for that of the jury"). Moreover, a court must "credit[] every inference that the jury might have drawn in favor of the [G]overnment." *United States v. Morrison*, 153 F.3d 34, 49 (2d Cir. 1998).

[25]     *United States v. McDermott*, 245 F.3d 133, 137 (2d Cir. 2001).

[26]     *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995).

[27]     *Guadagna*, 183 F.3d at 130 (quoting *Holland v. United States*, 348 U.S. 121, 139 (1954)); *Reyes*, 302 F.3d at 56 (by "discount[ing] evidence of guilty knowledge entirely because there were possible . . . innocent explanations for [defendant's] conduct," the district court "failed to view the evidence in the light most favorable to the [G]overnment"); *Autuori*, 212 F.3d at 114 ("[T]he [G]overnment need not negate every theory of innocence.").

8

conviction based on speculation and surmise alone cannot stand."[28] Moreover, a

"jury is entitled to a vast range of reasonable inferences, but may not base a

verdict on mere speculation."[29]

## III. DISCUSSION

### A. Substantive RICO

#### 1. Evidence at Trial

##### a. Evidence of Yanotti's Loansharking Activities Before July 21, 1999

The Government's bill of particulars identifies Yannotti's co-

conspirators in the loansharking conspiracies as Nicholas Corozzo, Lenny

DiMaria, Andrew DiDonato, and Salvatore Braccia.[30] The Government offered no

evidence at trial concerning Yannotti's involvement with Braccia. Furthermore,

DiDonato was arrested and began cooperating with the Government on May 8,

1997.[31] Accordingly, only the evidence of Yannotti's participation in

---

[28]     *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994).

[29]     *United States v. Wilson*, 160 F.3d 732, 737 (D.C. Cir. 1998) (quotation marks and citation omitted)).

[30]     *See* 5/23/05 Letter from AUSA Michael McGovern to Jeffrey Lichtman, counsel to John A. Gotti, at 10.

[31]     Because of that cooperation, DiDonato effectively withdrew from any loansharking conspiracy. Thus, none of his loansharking activities could have

loansharking conspiracies with Corozzo and DiMaria is relevant to Yannotti's statute of limitations defense.[32] To establish Yannotti's participation in the loansharking conspiracies with Corozzo and DiMaria, the Government relies on the testimony of three cooperating witnesses: Michael DiLeonardo, Anthony Rotondo, and Andrew DiDonato.

DiLeonardo testified that in December 1994, Nicholas Corozzo told him "how capable [Yannotti] was, he's a worker, chop shops, things like that, stolen car rings and [he's] a very capable guy that we trusted."[33] In response to the leading question: "At anytime did he discuss whether Yannotti was loansharking for him?" DiLeonardo answered: "Yes, he had different functions. Like I said, he was giv[ing] me his pedigree, and one thing would be loansharking, bookmaking. He had his own little crew around him."[34] DiLeonardo testified that throughout the 1990s, Corozzo was pushing for Yannotti to become a made member of the Gambino Family and had listed, as part of his criminal pedigree, his loansharking

---

occurred within the limitations period.

[32]    Corozzo was allegedly a captain in the Gambino Crime Family and DiMaria was allegedly a soldier and, at times, an acting captain.

[33]    Tr. at 2975-76.

[34]    *Id.* at 2976.

and bookmaking activities.[35]

Rotondo testified that in late 1994 or 1995, he was told by DiMaria, an acting captain for Nicholas Corozzo, that "he just had a couple of kids he was interested in and Mickey Y[annotti] was one of them and Nickey's son-in-law the other and they were going to be straighten him [sic] out."[36] DiMaria further told Rotondo that DiMaria and a number of Gambino soldiers "trusted [Yannotti] enough to take care of the loansharking book for [DiMaria], push money, collect money."[37]

DiDonato testified, without temporal reference, that as a member of Nicholas Corozzo's crew, Yannotti used a number of Gambino associates to help lend and then collect loansharking money.[38] DiDonato testified that he knew Yannotti made money from loansharking because DiDonato "was privy to some of his customers."[39] DiDonato testified that in 1996, Yannotti told DiDonato that he had to collect some loansharking money from a Gambino associate named Joe

---

[35]    *See id.* at 2976.

[36]    *Id.* at 1364.

[37]    *Id.* at 1364.

[38]    *See* Tr. at 1008, 1057.

[39]    *Id.* at 1008.

11

"Babes" Serrano.[40] Sometime between 1994 and 1995, Yannotti told DiDonato to catch up with a neighborhood kid named "Vinny" because Vinny owed Yannotti money.[41] DiDonato also interpreted two recorded telephone conversations in April 1996 between Yannotti and "James" and "Andy" as loansharking conversations.[42] Furthermore, DiDonato testified that despite Corozzo's arrest in 1996, Corozzo continued to collect the proceeds of a robbery through intermediaries.[43]

The Government contends that the testimony of these cooperating witnesses alone is sufficient to support Yannotti's involvement in loansharking

---

[40]     *See id.* at 1063.

[41]     *See id.* at 1009.

[42]     *See id.* at 1062-69. No evidence was offered at trial as to the identity or last names of these individuals.

[43]     *See id.* at 941-42. The Government incorrectly states that DiDonato testified that Corozzo continued to collect money on his "rackets" through intermediaries. Government's Memorandum of Law in Opposition to Defendant Yannotti's Post-Trial Motions ("Gov't Mem.") at 16. The transcript, however, reveals the following colloquy:

Q.     Even though Nicholas Corozzo, your captain, was still off the street at the end of 1996, were you still able to send money to him?
A.     Well, he wanted money from me from proceeds from *the robbery* . . .

Tr. at 941 (emphasis added).

activities after July 1999. Those witnesses testified that certain other Gambino

Family members and associates continued to collect and lend out money on the

street while incarcerated.[44] This was made possible because persons on the

outside passed messages to and from those incarcerated.[45] But the Government

presented no evidence of any particular message sent or received by Nicholas

Corrozzo or DiMaria while incarcerated.

Additionally, witnesses testified that certain Gambino Family

members were able to manage the loansharking book of an incarcerated

conspirator.[46] According to the Government, "[i]t was hardly a leap of faith for the

---

[44]     *See, e.g., id.* at 669-71, 890.

[45]     The Government cites numerous examples of such messages in its
opposition papers. *See* Gov't Mem. at 17-18. The Government has acknowledged
that one of the examples it provided was erroneous. *See* 12/2/05 Letter from
AUSA Michael McGovern to the Court at 1 n.1. The Government had argued that
Frank Fappiano passed messages to Nicholas Corozzo through Joseph Corozzo, an
attorney. *See* Gov't Mem. at 17 (citing Tr. at 307). However, the message did not
involve Nicholas Corozzo, but rather Jackie D'Amico, who was incarcerated at the
same facility as Fappiano and Corozzo. And the message was not sent through
Joseph Corozzo, an attorney, but through "Jo Jo" Corozzo, Nicholas Corozzo's
brother.

[46]     The Government points to Gambino Underboss Salvatore Gravano
who had a loansharking book worth millions of dollars when he decided to
cooperate with the Government in late 1991. *See id.* at 1935-37, 2895-96. Despite
Gravano's arrest and cooperation with the Government, DiLeonardo, at the
direction of John A. Gotti, Sr., was able to collect several hundred thousand
dollars. *See id.* at 2897-98.

jury to infer from this breadth of evidence that Yannotti managed Corozzo and DiMaria's sizeable loanshark book after their respective arrests and that this loanshark business continued as usual."[47] But the Government did not present any evidence that Yanotti continued the charged loansharking conspiracy after July 21, 1999.

### b. Purported Proof of Yanotti's Loansharking Activities After July 21, 1999

In addition to cooperator testimony, the Government cites other purported proof of Yannotti's involvement with loansharking. For example, New York City Police Detective Steven Bobbett testified that on December 16, 1999, during a lawful search of Yannotti, he recovered approximately $2,700 in one hundred dollar bills.[48] The Government also refers to alleged loansharking records which were recovered from Ralph Davino, a member of Nicholas Corozzo's crew,

---

[47]     Gov't Mem. at 20. Although the record indicates that Corozzo was incarcerated in December 1996, see Tr. at 2187, and that DiMaria was incarcerated at around the same time, the record does not contain the release dates for either. Although the exact release dates are not found in the record, Corozzo was incarcerated from December 1996 through June 2004 and DiMaria was incarcerated from December 1996 through March 2005. See Federal Bureau of Prisons -- Inmate Locator, at www.bop.gov/iloc2/LocateInmate.jsp.

[48]     See Tr. at 3921. The Government also notes that when Yannotti was arrested in June 2004, he was carrying $1,000 in cash. This, of course, is irrelevant because the Indictment charges that the loansharking conspiracy ran from 1993 to 2002. See Indictment ¶ 19(b) & (c).

14

at the time of his arrest in December 1996. Included in those records were the

names "Vinny," "JJ," "Tom," "Tony," and "Dom."[49] At the time of Yannotti's

arrest in July 2004, his address book listed the names and telephone numbers for

Vinny, JJ, Tom, Tony, and Dom.[50] The Government argues that because names

that appeared in Davino's loansharking records were also found in Yannotti's

address book this somehow proves that Yannotti continued to operate Nicholas

Corozzo's loansharking business eight years after Corozzo's arrest in 1996.

## 2.    Insufficiency of the Trial Evidence

No witness testified about any loansharking activity by or on behalf

of Corozzo, DiMaria, or Yannotti after 1996. There were no recorded

conversations concerning loansharking after 1996, nor were any loansharking

records found on Yannotti at any time after 1996. Furthermore, Yannotti's co-

conspirators, Corozzo and DiMaria, who, under the Government's own theory,

provided Yannotti with loansharking money, were arrested in December 1996, and

were incarcerated for many years thereafter, well beyond July 21, 1999. Although

there is evidence that *other* Gambino Family members may have continued

criminal conspiracies after the incarceration of co-conspirators, by passing

---

[49]    *See* Government Exhibits ("GX") 907C and 907D.

[50]    *See* GX 904.

15

messages for example, this only shows it was *possible* for Yannotti to continue the conspiracy after 1996. A speculative leap is required to conclude that Yannotti in fact continued loansharking.

With respect to the $2,700 found on Yannotti in December 1999, the money could have been the proceeds of any criminal conduct. No proof was offered connecting this money to loansharking activity. While a jury may draw reasonable inferences, it may not engage in impermissible speculation.[51]

There are two problems with the alleged loansharking records recovered from Davino. *First,* a review of the entire set of records seized from Davino reveals that the records were gambling records, not loansharking records.[52] Exhibits 907F and 907G are indisputably betting sheets with one referring to "picks" and the other to football games and point spreads. Exhibit 907E appears to be a record of bettors identified by customer number, *e.g.,* #6, #11. Significantly, some of the same names appearing on Exhibit 907E, such as JJ,

---

[51]    The jury was instructed accordingly. *See* Tr. at 5036 ("[T]he matter of drawing inferences from facts in evidence is not a matter of guesswork or speculation."). This instruction is in accordance with Sand's Modern Federal Jury Instructions, Criminal, *see* Instruction 6-1 ("An inference is not a suspicion or a guess.") and existing case law. *See D'Amato,* 39 F.3d at 1256; *Wilson,* 160 F.3d at 737.

[52]    *See* Exhibits 907E-G marked for identification, but not introduced at trial.

Tom, and Tony, also appear on Exhibit 907D, an alleged loansharking record. Thus, in all likelihood, Exhibit 907D was a gambling record, rather than a loansharking record. *Second,* Tom, Vinny, JJ, Tony, and Dom are common Italian names that constitute five of the forty-two names found in Yannotti's address book. Of greater interest is the fact that none of the more distinctive names found in Davino's records – like "Katz," "O'Toole," "Nate" and "Spider" – appear in Yannotti's address book. Simply put, the address book cannot support an inference that Yannotti continued to operate Nicholas Corozzo's loansharking business, even two years after Corozzo's arrest.

In sum, the evidence that Yannotti's loansharking activities extended into the limitations period is so meager that no reasonable jury could have found him guilty of that predicate act beyond a reasonable doubt. As outlined above, no witness testified that Yannotti was involved in loansharking after 1996. Similarly, no physical evidence such as recorded conversations, surveillance, or loansharking records, demonstrate Yannotti's involvement with loansharking after 1996.

### 3.    Presumption of Continuity

The Government therefore relies on the presumption of continuity set forth by the Second Circuit in *United States v. Spero.*[53] In *Spero,* the court held

---

[53]    331 F.3d 57.

that once the Government has met its "burden of proof by establishing that the loansharking conspiracy existed, it is entitled to a presumption that the conspiracy continued *until defendant demonstrated otherwise.*"[54] However, that presumption cannot continue indefinitely. The facts of *Spero* must be closely examined. In that case, the defendant was charged with conspiracy in violation of RICO. The statute of limitations cut-off was May 25, 1994, five years prior to the filing of the indictment.[55] The proof at trial revealed that the gambling enterprise with which defendant was involved terminated on or about December 1993, six months outside the limitations period.[56] Defendant argued that his loansharking activities were limited to that gambling enterprise.[57] The court held that the loansharking charges were not so limited and that Spero was presumed to have continued in those activities unless he proved that the goal of the conspiracy was accomplished or that he affirmatively withdrew from or abandoned the charged loansharking conspiracy.[58] Of course, it was only necessary to presume that Spero continued his activities for a period of six months to bring the indictment within the limitations

---

[54]     *Id.* at 61 (emphasis added).

[55]     *See id.* at 59.

[56]     *See id.* at 61.

[57]     *See id.*

[58]     *See id.*

period.

Other cases that have applied the presumption of continuity have done so where a co-conspirator, not the defendant, has committed an act or acts in furtherance of the conspiracy within the limitations period.[59] In these cases, the only question is whether the defendant should be liable for these co-conspiratorial acts where there is no proof that he engaged in any criminal conduct during the limitations period. In the absence of proof of withdrawal or abandonment, courts have held that the presumption of continuity permits the inference that the defendant is still involved in the conspiracy and therefore liable for the acts of his co-conspirators.[60]

The facts here are quite different from *Spero, Brown,* and *Salmonese.* Unlike in *Brown* or *Salmonese,* no evidence was offered at trial that *any* of the co-conspirators identified in the Government's Bill of Particulars conducted *any* loansharking activities within the limitations period. This case is also

_____

[59]     *See, e.g., United States v. Brown,* 332 F.3d 363, 373-74 (6th Cir. 2003) (applying the presumption of continuity where co-conspirators committed overt acts within the limitations period and two years after the last overt act was committed by the defendant); *United States v. Salmonese,* 352 F.3d 608, 616-17 (2d Cir. 2003) (concluding that statute of limitations was satisfied by evidence that defendant's co-conspirator received fraud proceeds within the limitations period despite defendant's argument that the conspiracy ended one month earlier, when their manipulation of the market for certain warrants ended).

[60]     *See Brown,* 332 F.3d at 374; *Salmonese,* 352 F.3d at 617.

distinguishable from *Spero* for two reasons: (1) given the absence of proof that any of the alleged co-conspirators engaged in loansharking during the limitations period, there is no rational basis to support the inference that two and a half years after his co-conspirators were incarcerated, Yannotti was still participating in loansharking with them[61] and (2) Yannotti's co-conspirators, who were the source of his loansharking funds, were incapacitated by virtue of their incarceration throughout those two and a half years.

Spero begs the question of how Yannotti can prove a negative – that the loansharking conspiracies alleged in Count One ended before July 21, 1999.[62] Of course, no witness testified that Corozzo's and DiMaria's loansharking activities, and Yannotti's affiliation therewith, ended permanently and forever in 1996. But like Sir Arthur Conan Doyle's dog that didn't bark, the lack of evidence of loansharking by Yannotti after 1996 is highly probative.[63] In the face

---

[61]     There is no question here of judging credibility, which a court may not do. Rather, this is a question of whether an inference has a rational basis or is an impermissible exercise of guesswork or speculation. *See* Tr. at 5036 (instructing the jury that "an inference is a logical factual conclusion which you might reasonably draw from other facts that have been proven").

[62]     *See Elkins v. United States*, 364 U.S. 206, 218 (1960) ("[A]s a practical matter it is never easy to prove a negative.").

[63]     "[T]he law draws no distinction between direct and circumstantial evidence in requiring the government to carry its burden of proof. A verdict of guilty may be based entirely on circumstantial evidence as long as the inferences

of this lack of evidence, the presumption that the loansharking conspiracy continued for two and a half years after the incarceration of both remaining co-conspirators is impermissible speculation.

Given the facts presented here – the length of the presumption, the proof that the co-conspirators in all likelihood could not have continued with their illegal activities, and the absence of proof regarding Yannotti's loansharking activities within the limitations period despite the testimony of three cooperators with knowledge of these particular conspiracies (DiLeonardo, Rotondo, and DiDonato) – the presumption alone is insufficient to sustain a conviction.[64] Together, these three circumstances are compelling circumstantial evidence that the loansharking conspiracies alleged in the Indictment terminated well before July 21, 1999, thus rebutting the presumption of continuity. To hold otherwise

---

of culpability drawn from the circumstances are reasonable." *MacPherson*, 424 F.3d at 190 (citations omitted). Accordingly, it follows that a defendant's burden to affirmatively prove that a conspiracy terminated or was abandoned may also be satisfied by circumstantial evidence. To hold otherwise would violate due process. A district court may acquit a defendant after a jury verdict of guilty based on circumstantial evidence where nearly equal circumstantial evidence supports a theory of innocence. *See Cassese*, 428 F.3d at 103.

[64]    Albeit in a different context and not of recent vintage, the Second Circuit has suggested that at some point, the lack of evidence of participation in a conspiracy by a low-level drug conspirator for a substantial period of time suffices to extinguish the presumption of continuity. *See United States v. Borelli*, 336 F.2d 376, 384 (2d Cir. 1964).

would eviscerate the requirement that the Government prove its case against a defendant beyond a reasonable doubt and undermine the purpose of the statute of limitations. There is simply no evidence in this record that any of the alleged co-conspirators engaged in loansharking during the limitations period. I therefore conclude that no reasonable jury could have found that Yannotti participated in that conspiracy after July 21, 1999. Count One of the Indictment is therefore dismissed pursuant to Rule 29.

## B. RICO Conspiracy

There can be no claim that the goals of the charged RICO conspiracy – to conduct the affairs of the Gambino Organized Crime Family through a pattern of racketeering activity – ended outside the limitations period. However, Yannotti argues that while the charged *enterprise* is the Gambino Organized Crime Family, the charged *conspiracy* is the agreement to participate in the conduct of the affairs of that enterprise through a pattern of racketeering activity, and that the enterprise and the conspiracy cannot be the same.[65] Yannotti further argues that "it is not enough for the Government to establish that the defendant continued to act *as a member of the alleged organized crime family* in order to satisfy the statute of limitations; the Government must establish that the defendant

_____

[65]    *See* Memorandum of Law in Support of Defendant Michael Yannotti's Post-Trial Motions at 6.

agreed to participate in the enterprise's affairs through the particular pattern of racketeering activity charged in the indictment."[66] Finally, Yannotti concludes that if the evidence shows that he neither committed a charged predicate act within the five-year limitations period nor that he agreed to participate in the enterprise's affairs through the particular pattern of racketeering activity charged in the Indictment during that period, then the statute of limitations is not satisfied as to the RICO conspiracy count as well as the RICO substantive count.[67]

Yannotti's argument, however, ignores the teaching of *United States v. Persico,* which held that the agreement "proscribed by section 1962(d) is conspiracy to participate in a charged enterprise's affairs, not conspiracy to commit predicate acts."[68] There was more than sufficient evidence at trial to support the finding that the activities of the Gambino Organized Crime Family continued into the limitations period and that Yannotti was a member of that conspiracy. Viewed in the light most favorable to the Government, the Government proved beyond any reasonable doubt that the activities of the enterprise, through the pattern of racketeering activity charged in the Indictment,

---

[66]   *Id.* at 6-7 (emphasis in original).

[67]   *See id.* at 7.

[68]   *Persico,* 832 F.2d at 713.

23

continued well into the limitations period. For example, there was substantial

evidence that the conspiracy to commit extortion in the construction industry and

the conspiracy to commit securities fraud extended well into the limitations

period.[69] Because there is no evidence that Yannotti withdrew from the

conspiracy, he remains responsible for those activities.[70] Therefore, Yannotti's

argument that he is entitled to a judgment of acquittal on the RICO *conspiracy*

charge because the Government failed to prove that the loansharking conspiracies

---

[69] *See, e.g.,* Tr. at 2724 (DiLeonardo testifying that he handled illegal business activities on behalf of the Gambino family in the spring of 2000 in the construction industry and stock market); *id.* at 2751-52 (testimony from DiLeonardo stating that he received proceeds of Sal Romano and Joseph Quatrocchi's stock fraud schemes until 2002 and that he distributed those proceeds to Louis Mariani, Joseph D'Angelo, John Junior, and the Family); *id.* at 2956 (DiLeonardo stating that he and Louis Mariani last divided proceeds from Sal Romano's "pump and dump" schemes in 2002); *id.* at 2919 (DiLeonardo testifying that as head of the construction panel for the Gambino family, he distributed construction industry extortion proceeds to John Gotti, Jr. during the period 1992 to June 2002); *id.* at 3869 (Quattrochi stating that he pled guilty to a massive stock fraud scheme involving the Gambino Crime Family that continued into 2002).

[70] Indeed, the Government offered evidence at trial that Yannotti continued to meet with and have telephonic contact with other members and associates of the Gambino family well after July 1999. *See, e.g.,* Tr. at 3911-14, 4138-39, GX 1118. A defendant is liable for the acts of his co-conspirators if the acts were taken in furtherance of the conspiracy and were a reasonably foreseeable consequence of the conspiratorial agreement. *See Pinkerton v. United States,* 328 U.S. 640, 646-48 (1946). *See also United States v. Vario,* 943 F.2d 236, 240 (2d Cir. 1991) ("[I]t is a fundamental tenet of the law of conspiracy that reasonably foreseeable acts of individual co-conspirators taken in furtherance of the conspiracy count against all members equally . . . .").

charged as predicate acts in the RICO *substantive* charge continued into the limitations period, is rejected.

## IV.   CONCLUSION

For the foregoing reasons, Yannotti's motion under Rule 29 for a judgment of acquittal is granted as to Count One and denied as to Count Two. The Clerk of the Court is directed to close this motion (Document # 151).

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:     New York, New York
           December 30, 2005

## - Appearances -

**For Defendant:**

Diarmuid White, Esq.
White & White
148 East 78th Street
New York, New York 10021
(212) 861-9850

**For the Government:**

Michael G. McGovern
Joon H. Kim
Victor L. Hou
Assistant United States Attorneys
One St. Andrew's Plaza
New York, New York 10007
(212) 637-2198/2212/2408