

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

August 28, 2020

**By ECF and Email**

The Honorable Paul G. Gardephe
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

      Re:     *United States v. Michael Yannotti*, **04 Cr. 690 (PGG)**

Dear Judge Gardephe:

      The Government respectfully submits this letter in opposition to defendant Michael Yannotti's July 31, 2020 motion for a reduction in sentence pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). (Dkt. 318). The Government opposes the defendant's motion for two independent reasons. *First*, the defendant has not shown extraordinary and compelling reasons for a reduction in his sentence. *Second*, and in any event, the factors under 18 U.S.C. § 3553(a) weigh against a reduction in his sentence.

**I.**     **Background**

      The defendant was an associate and soldier in the Gambino Organized Crime Family during a time when that Family was involved in, among other things, conspiracy to commit extortion in the construction industry and conspiracy to commit securities fraud. (Presentence Investigation Report revised Nov. 9, 2006 ("PSR") ¶ 53). In addition, the defendant participated in the Family's loansharking activities. (*Id.*). In 2005, the defendant was convicted of racketeering conspiracy, in violation of 18 U.S.C. § 1962(d). (*Id.* ¶¶ 23, 33). In 2006, Judge Scheindlin sentenced the defendant to 240 months' imprisonment and 3 years' supervised release. (Dkt. 288). The defendant, who is 57 years old, is incarcerated at FCI Ashland and is scheduled to be released on September 29, 2021. *See* https://www.bop.gov/inmateloc (search "Michael Yannotti") (visited Aug. 28, 2020).

      On April 27, 2020, the defendant requested that the Warden of FCI Ashland reduce the defendant's sentence based on the COVID-19 pandemic. (Dkt. 318-2 at 1-4).[1] On May 19, 2020,

---

[1] In the alternative, the defendant requested that he be transferred to home confinement. (Dkt. 318-2 at 4-5).

1

the Warden denied that request. (Dkt. 318-4).[2] On July 31, 2020, the defendant filed the instant motion, requesting a reduction in sentence based on the COVID-19 pandemic. (Dkt. 318 at 8).[3]

## II.  Applicable Law

Under 18 U.S.C. § 3582(c)(1)(A)(i), as amended by the First Step Act, the Court "may not modify a term of imprisonment once it has been imposed except" as provided by statute. As relevant here:

> [T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

*Id.* The applicable policy statement, which appears at § 1B1.13 of the U.S. Sentencing Guidelines, provides that a reduction in sentence is permitted if: "extraordinary and compelling reasons warrant the reduction," U.S.S.G. § 1B1.13(1)(A); "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)," *id.* § 1B1.13(2); and "the reduction is consistent with this policy statement," *id.* § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13, in turn, describe three instances that a defendant can show an "extraordinary and compelling reason": (A) the defendant has a serious medical condition, such as a terminal illness; (B) the defendant is, among other things, at least 65 years old and seriously deteriorating; or (C) the defendant's family circumstances have changed such that the defendant is the only available caregiver for a minor child or incapacitated spouse. U.S.S.G. § 1B1.13 app. note 1(A)-(C). The application notes also allow a catchall condition where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." *Id.* at app. note 1(D). Subsection (A) is most relevant here. It provides in full:

---

[2] It appears that the defendant's request to be transferred to home confinement is still pending. (*See* Dkt. 318-4).

[3] In the alternative, the defendant requests that the Court recommend that the Federal Bureau of Prisons (the "BOP") transfer the defendant to home confinement. (Dkt. 318 at 8). Here, the same reasons that counsel against a reduction in sentence, *see infra* Part III, militate against home confinement. *See, e.g.*, *United States v. Francisco*, 2020 WL 3507958, at *3 (S.D.N.Y. June 29, 2020) (Engelmayer, J.).

> (A) Medical Condition of the Defendant.—
>
>> (i) The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>>
>> (ii) The defendant is—
>>
>>> (I)   suffering from a serious physical or medical condition,
>>>
>>> (II)  suffering from a serious functional or cognitive impairment, or
>>>
>>> (III) experiencing deteriorating physical or mental health because of the aging process,
>>
>> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

*Id.* at app. note 1(A).

As the movant, the defendant bears the burden of proving that "extraordinary and compelling reasons" exist under the above criteria to justify early release. *See United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992) ("A party with an affirmative goal and presumptive access to proof on a given issue normally has the burden of proof as to that issue.").

Whether such "extraordinary and compelling reasons" exist, however, is only "[t]he threshold question." *United States v. Daugerdas*, 2020 WL 2097653, at *2 (S.D.N.Y. May 1, 2020) (Pauley, J.). "[T]his Court's analysis does not end with a finding that 'compelling and extraordinary reasons' warrant compassionate release. This Court must also 'consider[] the factors set forth in section 3553(a).'" *Id.* at *4.

Those § 3553(a) factors include, among others:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant; [and]
(2) the need for the sentence imposed—
    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (B) to afford adequate deterrence to criminal conduct; [and]
    (C) to protect the public from further crimes of the defendant . . . .

18 U.S.C. § 3553(a).

**III.     Discussion**

    **A. The Defendant Has Not Shown Extraordinary And Compelling Reasons For A Sentence Reduction**

In support of the argument that extraordinary and compelling reasons justify a reduction in the defendant's sentence, he cites two facts: his age (57 years old) and his asthma. (Dkt. 318 at 20). Neither suffices.

As to the defendant's age, he notes that, according to the Centers for Disease Control and Prevention (the "CDC"), "people in their 50s are at higher risk for severe illness than people in their 40s." (*Id.* at 16). That statement, however, is taken out of context. The full statement from the CDC reads: "As you get older, your risk for severe illness from COVID-19 increases. For example, people in their 50s are at higher risk for severe illness than people in their 40s. *Similarly, people in their 60s or 70s are, in general, at higher risk for severe illness than people in their 50s. The greatest risk for severe illness from COVID-19 is among those aged 85 or older.*" See https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (visited Aug. 28, 2020) (emphasis added). In light of that emphasized language, it is unsurprising that courts, including courts in this District, have found that being in one's 50s—or even older—does not constitute extraordinary and compelling reasons. *See, e.g.*, *United States v. Saleh*, 2020 WL 3839626, at \*1, \*3 (S.D.N.Y. July 8, 2020) (Pauley, J.) (64 years old); *United States v. Sattar*, 2020 WL 3264163, at \*2 (S.D.N.Y. June 17, 2020) (Koeltl, J.) (60 years old); *United States v. Haney*, 2020 WL 1821988, at \*5 (S.D.N.Y. Apr. 13, 2020) (Rakoff, J.) (61 years old).

As to the defendant's asthma, the most recent guidance from the CDC makes clear that, unlike individuals with certain underlying medical conditions, such as chronic obstructive pulmonary disease, who "*are* at increased risk of severe illness from COVID-19," individuals with moderate to severe asthma simply "*might be* at an increased risk." *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (visited Aug. 28, 2020) (emphasis added).

The defendant's recent medical records from the BOP indicate that his asthma is not moderate to severe, but instead is mild. *See generally* Exhibit A.[4] As a result, the defendant's asthma does not put him even in the category of individuals who the CDC says "*might be* at an increased risk." *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (visited Aug. 28, 2020) (emphasis added).

---

[4] The Government respectfully requests that Exhibit A, which contains the defendant's BOP medical records since 2017, be filed under seal.

4

Even assuming for the sake of argument, however, that the defendant's asthma were moderate to severe, courts, including courts in this District, have denied sentence reduction motions on the ground that a defendant's moderate to severe asthma during the COVID-19 pandemic does not constitute "extraordinary and compelling reasons." *See, e.g.*, *United States v. Pomales*, 2020 WL 4677596, at *2 (S.D.N.Y. Aug. 12, 2020) (Swain, J.); *United States v. Battle*, 2020 WL 4677414, at *1-2 (S.D.N.Y. Aug. 12, 2020) (Marrero, J.); *United States v. Gray*, 2020 WL 4677508, at *1 (S.D.N.Y. Aug. 11, 2020) (Rakoff, J.). This Court should do the same.[5]

Additionally, the precautions being taken by the BOP generally to protect inmates from COVID-19, and the relative safety of the specific facility where the defendant is housed, are further barriers to the defendant showing "extraordinary and compelling reasons." Starting in January 2020, the BOP implemented a multi-phase COVID-19 Action Plan. *See* https://www.bop.gov/resources/news/20200313_covid-19.jsp (visited Aug. 28, 2020). The BOP continues to revise and update that Action Plan in response to the fluid nature of the COVID-19 pandemic, and in response to the latest guidance from experts at the World Health Organization, the CDC, and the Office of Personnel Management. *See id.* Phase One involved a study of "where the infection was occurring and best practices to mitigate transmission." *Id.* In addition, the BOP stood up an "agency task force" to study and coordinate its response to COVID-19. *Id.*

On March 13, the BOP implemented Phase Two. *See* https://www.bop.gov/resources/news/pdfs/20200324_bop_press_release_covid19_update.pdf (visited Aug. 28, 2020). The BOP "issued directives suspending social and legal visits, curtailing movement, cancelling staff travel and training, limiting access for contractors and volunteers, and established enhanced screening for staff and inmates for locations with sustained community transmission and at all medical centers." *Id.* All facilities were placed on modified operations to maximize social distancing as much as practicable. *Id.* This modification included staggered meal times and staggered recreation times, for example, to limit congregated gatherings. *Id.* Additionally, the BOP established quarantine and isolation procedures. *Id.*

On March 18, the BOP implemented Phase Three, which entailed: (a) implementing an action plan to maximize telework for employees and staff; (b) inventorying all cleaning, sanitation, and medical supplies; (c) making sure that ample supplies were on hand and ready to be distributed or moved to any facility as deemed necessary; and (d) placing additional orders for those supplies, in case of a protracted event. *See id.*

On March 26, the BOP implemented Phase Four. *See* https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp (visited

---

[5] Prior to the CDC's most recent guidance, the CDC had listed moderate to severe asthma as a COVID-19 risk factor. *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/evidence-table.html (visited Aug. 28, 2020). Even then, however, courts, including courts in this District, denied sentence reduction motions on the ground that a defendant's asthma during the COVID-19 pandemic did not constitute "extraordinary and compelling reasons." *See, e.g.*, *United States v. Foozailov*, 2020 WL 3268688, at *2 (S.D.N.Y. June 17, 2020) (Schofield, J.); *United States v. Merlo*, 2020 WL 3001039, at *2 (S.D.N.Y. June 4, 2020) (Kaplan, J.); *United States v. Garcia*, 2020 WL 2539078, at *2 (S.D.N.Y. May 19, 2020) (Sullivan, J.).

Aug. 28, 2020). The BOP updated its quarantine and isolation procedures to require that all newly admitted inmates to BOP facilities, whether in a sustained community transition area or not, be assessed using a screening tool and temperature check. *Id*. Asymptomatic inmates were placed in quarantine for a minimum of 14 days or until cleared by medical staff. *Id*. Symptomatic inmates were placed in isolation until they tested negative for COVID-19 or were cleared by medical staff as meeting CDC criteria for release from isolation. *Id*.

On April 1, the BOP implemented Phase Five, *id*., and, on April 14, the BOP implemented Phase Six, which extended the Phase Five measures until May 18, 2020, *see* https://www.bop.gov/resources/news/pdfs/20200414_press_release_action_plan_6.pdf (visited Aug. 28, 2020). Those measures include: (i) securing inmates in their assigned cells or quarters; (ii) coordinating with the U.S. Marshals Service to significantly decrease incoming movement; (iii) granting inmates access, to the extent practicable, to programs and services that are offered under normal operating procedures, such as mental health treatment and education; and (iv) affording limited group gathering, to the extent practicable, to facilitate access to commissary, laundry, showers, telephones, and computers. *See* https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp (visited Aug. 28, 2020). In April, the BOP "began expanding COVID-19 testing of inmates." *See* https://www.bop.gov/resources/news/20200424_expanded_testing.jsp (visited Aug. 28, 2020).

Currently, the BOP is implementing a set of "Modified Operations" to "mitigate the spread of COVID-19" and to "maximize social distancing in [its] facilities." *See* https://www.bop.gov/coronavirus/covid19_status.jsp (visited Aug. 28, 2020). Social visits are suspended, inmate movement is "suspended with limited exceptions" to "assure that administrative facilities do not become overcrowded," and the BOP is "taking proactive steps, including aggressive testing, to mitigate the transmission of COVID-19 into the federal prison environment." *Id*. New inmates are tested upon arrival at BOP detention centers and again before movement to their ultimate facility. *Id*.

With respect to the defendant's particular facility, FCI Ashland, according to the BOP website's COVID-19 reporting, out of a population of 961 inmates, none is currently testing positive for COVID-19 and none has died of COVID-19. *See* https://www.bop.gov/coronavirus (visited Aug. 28, 2020); https://www.bop.gov/locations/institutions/ash (visited Aug. 28, 2020).

In light of the measures taken by the BOP generally and the relative safety of FCI Ashland specifically, the defendant cannot demonstrate "extraordinary and compelling reasons" for a reduction in his sentence.

### B. The 18 U.S.C. § 3553(a) Factors Counsel Against A Reduction In The Defendant's Sentence

Even if the defendant could show the requisite "extraordinary and compelling reasons," his motion should nevertheless be denied because the relevant factors under § 3553(a) weigh against a reduction in his sentence. As for "the nature and circumstances of the offense" and "the need for the sentence" "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," §§ 3553(a)(1), (2)(A), Judge Scheindlin correctly

highlighted at sentencing "the serious nature of the offense in which [the defendant] engaged, . . . most importantly, his willingness to engage in violence and potentially murder to further the goals of [the Gambino Organized Crime Family]." (Sentencing Transcript ("Sent. Tr.") at 35).  As Judge Scheindlin recounted, "[t]he evidence at trial demonstrated that [the defendant] had been a long[-]time associate and member of [the Gambino Organized Crime Family] which had engaged in many crimes in furtherance of the illegal enterprise, including murder, attempted murder, kidnapping, construction industry extortion, loan sharking and securities fraud." (*Id.* at 33).  "The [trial] testimony," Judge Scheindlin continued, "revealed that [the defendant] was a loyal soldier of [the Gambino Organized Crime Family], which means that he was willing to repeatedly engage in violence on behalf of the organization whenever needed." (*Id.*).  For example, "[w]hen directed to participate in [an] attack . . . in which the plan was to administer a physical beating, [the defendant] took it upon himself to escalate the events by shooting at [the victim] at point blank range using hollow point bullets." (*Id.*).  According to Judge Scheindlin's "assessment of the evidence, [the defendant] meant to kill [the victim] and only missed accomplishing this goal because [the victim] acted with superhuman strength and ingenuity . . . ." (*Id.*).  "[L]oan sharking," Judge Scheindlin added, "is inherently violent because its victims know that they will be subject to violence unless they stay current in their payments.  Loan sharking only exists and succeeds because of the threat of terrible violence." (*Id.* at 33-34).

As for the defendant's "history" and "the need for the sentence" "to afford adequate deterrence" and "to protect the public from further crimes of the defendant," §§ 3553(a)(1), (a)(2)(B)-(C), Judge Scheindlin highlighted "the years of criminal conduct in which [the defendant] was clearly engaged" and reasoned that, "given his many years as a member of organized crime who repeatedly engaged in violent conduct, . . . the public does need protection from this defendant." (Sent. Tr. at 34-35).

Judge Scheindlin properly took account of the § 3553(a) factors when she sentenced the defendant to 240 months' imprisonment.  Reducing his sentence to time served now would do violence to the interests underlying § 3553(a).  During the COVID-19 pandemic, courts, including courts in this District, have repeatedly denied motions for reductions in sentence on § 3553(a) grounds.  *See, e.g.*, *United States v. Al Kassar*, 2020 WL 4813199, at *2 (S.D.N.Y. Aug. 19, 2020) (Rakoff, J.); *United States v. Cremer*, 2020 WL 4746569, at *6 (S.D.N.Y. Aug. 17, 2020) (Ramos, J.); *United States v. Givens*, 2020 WL 4699042, at *3-4 (S.D.N.Y. Aug. 13, 2020) (McMahon, C.J.).  This Court should do so here.

7

## IV.      Conclusion

       The Court should deny the defendant's motion. The defendant has not shown extraordinary and compelling reasons for a sentence reduction. Even if he had, the factors set forth in 18 U.S.C. § 3553(a) counsel against a reduction in his sentence.

                                               Respectfully submitted,

                                               AUDREY STRAUSS
                                               Acting United States Attorney

                           By:     */s/ Samuel P. Rothschild*
                                               Samuel P. Rothschild
                                               Assistant United States Attorney
                                               (212) 637-2504

cc:      Joseph R. Corozzo, Esq. (by ECF and email)